## The First National Bank of Marquette v. Charles Crowley.

*Personal property: Contract of sale: Delivery: Title: Replevin.* Under a contract for the sale of two hundred tons of No. 1 pig iron, to be thereafter delivered where the vendor is engaged in the manufacture of various grades of iron and producing large quantities daily, and all the iron so manufactured is piled, as fast as made, upon the dock in separate piles, according to the several qualities, as the vendor chooses to determine it, in the absence of any inspection for, or acceptance by, the vendee, or of any mark upon any of the respective piles to identify them as belonging to the vendee or to distinguish them from any others of the same grade, the title to any specific portion does not pass to the vendee; and he cannot recover in an action of replevin against the sheriff for taking any portion thereof on a valid execution against the vendor.—*Whitcomb v. Whitney, supra, approved.*

*Finding of facts, how construed.* A judge's finding of facts, under circuit court rule 87, must be taken together as a whole; and where it states something which the other facts found show he could not have found literally as a fact, this court will so construe it, if possible, as to make the finding consistent as a whole.

*Replevin: Sheriff: Execution: Special property: Assessment of value.* In an action of replevin against the sheriff who has taken the property on executions against a third person, and not from the possession of the plaintiff, where the judgment is in favor of the sheriff, it is not error to assess his damages, on a waiver of the return of the property, at the full value of the property, notwithstanding it exceeds the amount of the executions in his hands. The plaintiff had no right to the property whatever, and as between him and the sheriff the latter had the whole title, and would be bound to account for any surplus to the execution debtor. The statute (*Sess. L., 1865, p. 325*), providing for an assessment of the value of the special property only, of the party, does not apply to such a case.

*Heard April 11. Decided April 16.*

Error to Marquette Circuit.

This case was tried by the court without a jury, and the following facts were found under circuit court rule No. 87:

The plaintiff is a corporation organized for the purpose of transacting the business of banking, under and by virtue of an act of congress, approved June 2, 1864, and has had its bank, or place of business, in the village (now the city) of Marquette, since said plaintiff was incorporated.

About one week previous to the 19th of August, 1870, at the said place of business of the plaintiff in Marquette, the Schoolcraft Iron Company, a corporation, by one Henry R. Mather, its duly authorized agent, agreed to sell one hundred tons of No. 1 (so called) pig iron to the plaintiff, at thirty dollars per ton, to be delivered thereafter; in consideration whereof the plaintiff advanced and paid the said Schoolcraft Iron Company the sum of twenty-five hundred dollars.

On the 19th of August, 1870, at plaintiff's said place of business in Marquette, the plaintiff purchased one hundred other tons of pig iron from the said Henry R. Mather, the agent of the said Schoolcraft Iron Company, and acting for said company, at thirty dollars per ton, to be delivered to the plaintiff thereafter. The plaintiff paid a part of the purchase price on said day, and within a week thereafter paid the remainder of the entire amount of the price of the two parcels of iron, making in all two hundred tons, which was to be delivered to the plaintiff at the place where it was manufactured.

The Schoolcraft Iron Company, at the time of the said sales to plaintiff, had its furnace for the manufacture of its pig iron at Munising, on, or near, the shores of Lake Superior, in Schoolcraft county, several miles from Marquette; was manufacturing large quantities daily, from fourteen to seventeen tons, and as fast as its iron was made

piled it on its wharf or dock near to its furnace, classifying it by numbers. To indicate its quality the different numbers were piled separately, but at the same place, and said numbers were of a scale from 1 to 5. Numbers 1 and 2 were classed as "soft" or "Chicago iron," and the remaining numbers up to, and including, 5 were classed as "hard;" the latter was regarded as the more valuable, and brought the better or higher price in market. There was no figure, mark or number placed on said iron, so piled on said wharf, to indicate its quality or amount to any ordinary or general observer.

At the time of making said sale, one James F. McCollum, who was book-keeper and shipping agent of the said Schoolcraft Iron Company, at its furnace at Munising, was present at plaintiff's said bank, where said sale was made, and he was then and there instructed by said Mather to pile the said iron separately as fast as it should be made, and deliver the said two hundred tons of pig iron to the plaintiff, at the place of piling, on the said wharf of the company at Munising.

The said McCollum, after being so instructed by said Mather, on the said 19th day of August, did not return to Munising, or communicate therewith, until August the 27th following, eight days after receiving his said instructions to deliver the property to the plaintiff.

The pig iron purchased by the plaintiff from the said Schoolcraft Iron Company, as aforesaid, was soft or Chicago iron.

The defendant was sheriff of Marquette county during the year 1870, and also of the territory known as Schoolcraft county, which was at that time attached to Marquette county for judicial purposes; and as such sheriff, on the 26th day of August, 1870, he levied on sixty-five and three-fourths tons of No. 1 pig iron, being all the No. 1 pig

iron then lying and being on the aforesaid wharf of the said Schoolcraft Iron Company at said Munising.

This sixty-five and three-fourths tons of pig iron was manufactured and placed by the Schoolcraft Iron Company on its wharf, with other quantities and qualities of its iron there, and was not distinguished therefrom by any outward marks, sign or indication which would indicate to an observer that said sixty-five and three-fourths tons of pig iron belonged to the plaintiff or any other person or party, instead of the Schoolcraft Iron Company. It was a part of the two hundred tons bargained for as aforesaid by the plaintiff, and is the same described in its declaration.

The defendant made his levy on said sixty-five and three-fourths tons of pig iron, by virtue of two certain writs of execution against said company, directed and delivered to him, as sheriff of said county of Marquette, and the territory attached thereto for judicial purposes, in favor, respectively, of Eber B. Ward, for the sum of one thousand six hundred and seventy dollars and fifty-eight cents, and of Frederick LeFever, for the sum of one hundred and sixty-two dollars and eighty-three cents; and at the time of making said levy, as well as at the time of the service of the writ of replevin in this cause, the said writs of execution were alive, in force and valid.

The value of the pig iron in question, on the day of the taking thereof under the writ of replevin in this cause, at the place where taken, was thirty-four dollars per ton. The said iron had been sold by the plaintiff, and the proceeds of such sale converted by it.

The judgment was for the defendant, and the plaintiff brought error.

*Maynard & Ball* and *E. W. Meddaugh,* for plaintiff in error.

*W. P. Healey* and *Ashley Pond,* for defendant in error.

CHRISTIANCY, CH. J.

This was an action of replevin, brought by the bank against the defendant, for two hundred tons of pig iron, claimed to have been purchased by the bank from the Schoolcraft Iron Company.

The judge, before whom the trial was had without a jury, made a special finding of facts in the nature of a special verdict, to which reference is here made for a full statement of the facts.

Judgment was rendered for the defendant, who, as sheriff, had seized the iron upon two executions against the iron company; the judge holding the sale to be incomplete for want of delivery, and that the property did not pass to the plaintiff.

The question is, therefore, the same as in the case of *Whitcomb v. Whitney, supra;* our decision in which has just been read by my brother Cooley.

When, and under what circumstances, delivery is necessary to pass the property under a contract of sale, and when it will pass without delivery, have been so clearly explained by my brother Cooley in the opinion just read, as to make it quite unnecessary to go over the same ground again, as the same principles are involved in both cases. But, while the facts in the two cases are in some respects similar and the principles involved are the same, yet the facts differ so materially in some of their essential characteristics that, in applying to them the same principles, an opposite result must be reached.

Thus, in the former case, the contract was for the purchase of *all* the lumber of certain specified qualities which the vendor should make at a certain place during the season. The vendor could not, therefore, sell any of it without violating his contract; and as fast as the different qualities

were ascertained and set apart, they were identified as the very lumber by the contracts agreed to be sold.

In the present case the contract was to sell two hundred tons of No. 1 pig iron, to be thereafter delivered; the vendor being engaged in the manufacture of various grades of iron at their furnace, and producing large quantities of each daily. The contract would, therefore, be satisfied with *any* iron of this grade; and the vendors were, therefore, at liberty to sell any *particular* iron, though of the same grade, which they then had or might subsequently make, including the *very iron in dispute*, had they chosen to do so, without any violation of the contract with the plaintiff. And they were at liberty to enter into just as many contracts of the same kind with other parties as they might choose, without any violation of that made with the plaintiff; as the contract with the plaintiff referred to no specific iron, and would be satisfied with the requisite amount of *any iron* of the quality called for.

In the other case the lumber was inspected, separated into its various classes, and the amount of each set apart, ascertained and accepted by the agent of the purchaser; and was piled upon the dock awaiting shipment, when the purchaser should choose to send his vessel for it.

But in the present case *all* the iron *manufactured at the furnace* of the vendors was piled as fast as made, upon the dock, and though in separate piles according to the several qualities as the vendors chose to determine it, the iron in question, though of the quality called for, had never been inspected for, or seen by, the plaintiff or any agent of the plaintiff. There were no marks upon it, or upon any of the respective piles; and until something further should be done to identify it as the very iron intended by the contract of sale, it would be impossible to know that this was the particular iron covered by that contract. Nothing had been done to dis-

tinguish it from any other iron of the same grade which had been, or might thereafter be, manufactured by the vendors; and though they might have intended it for the plaintiff, yet the latter had received no notice through its agent or otherwise, that it had yet been manufactured, and was not even aware of its existence. And it does not appear that even the vendors knew its weight or amount. Clearly, under this state of facts, the vendors would have had the right to sell and deliver this particular iron to any other person, and the purchaser would hold it against the plaintiff. The vendors would have had a perfect right to say to the plaintiff: " True, we agreed to sell you two hundred tons of iron, but it was not this *particular* iron, though of the same quality, and we will proceed to manufacture it for you as fast as we can."

Had this iron, instead of being seized on execution, been stolen from the dock or thrown into the lake, in such manner as to be irretrievably lost, and the vendors had insisted that it was the plaintiff's property, and that the latter should bear the loss, would it not have been a conclusive reply for the plaintiff to say? "You not only had never delivered the iron, but you never even gave me notice that it was ready for delivery, so that I had any right to take it. I not only never saw, inspected or accepted it, nor knew its quantity or quality; but you had done nothing to indicate that you intended it for me as a part of the iron called for by the contract. You treated it as you did all the rest of the iron manufactured at your works, and did nothing by which I could know that it was intended to fill my contract. The iron was yours, and you must bear the loss."

Had the plaintiff, under the circumstances existing at the time of this levy, called upon the vendors and demanded this iron, and the latter had refused to give it up, it is

clear the plaintiff could not have maintained replevin for it against the vendors, and therefore equally clear that he cannot maintain it against the sheriff who has seized it as the property of the vendors.

But it is urged that the judge has expressly found that this particular iron "was part of the two hundred tons bargained for as aforesaid by the plaintiff, and is the same described in the declaration." But we must take the whole finding together, and the other facts found show that it was not in the power of the judge, under such a state of facts, to find this literally as a fact, when it had not been identified as between the parties, as the evidence shows it had not. The most that can be meant by this (and this is clearly enough shown in the subsequent remarks of the judge in applying the law to the facts) is, either that it was iron of the same description as that bargained for, or that the vendors intended it for the plaintiff under the contract. We think, therefore, the circuit judge was correct in his conclusion that the property had not passed to the plaintiff.

The defendant elected to waive a return of the property, and to take judgment for its value and interest, which was assessed by the court at two thousand three hundred and forty-one dollars and fifty-six cents. This was somewhat more than the amount of the executions under which the defendant had levied; and this is urged as error under section 29, chapter 124, Revised Statutes of 1846 (*Comp. L.,* § *5033, as amended by act of 1865*), which provides that, "when either of the parties to an action of replevin, at the time of the commencement of the suit, shall have only a lien upon, or a special property or part ownership in, the goods and chattels described in the writ, and is not the general owner thereof, that fact may be proved on the trial, or on the assessment of value, or on the assessment of

damages in all cases arising under this chapter, and the finding of the jury or court, as the case may be, shall be according to such fact; and the court shall thereupon render such judgment as shall be just between the parties."

Undoubtedly, under this provision, had it appeared that the plaintiff had the right to the property or its possession, subordinate only to the executions, or had the property been taken by the defendant from the possession of the plaintiff, the assessment and the judgment should only have been for the amount of the executions. But here the property was not taken from the possession of the plaintiff, and it clearly appears that plaintiff had no right to the property or its possession; but having obtained the whole property under the writ from the sheriff, who at the time had the right of possession of the whole under the executions, we think the sheriff has the right, as against the plaintiff, to recover the whole, being accountable over to the vendors for the excess beyond the executions and costs, on the same principle that he would have been liable to return any surplus of the property after selling enough to satisfy the executions, or to pay over any surplus of proceeds on a rightful sale (where that is permitted) for more than the execution debt.

The judgment of the circuit court must be affirmed, with costs.

COOLEY and CAMPBELL, JJ., concurred.

GRAVES, J., did not sit in this case.