## YATES *v.* JONES *et al.*

The evidence did not support the finding of the auditor in favor of the defendant in error, and it was error to overrule the exception based on the ground that it was contrary to law and without evidence to support it.

JANUARY 16, 1912.

Exceptions to auditor's report. Before Judge Reagan. Monroe superior court. October 1, 1910.

*Persons & Persons* and *C. J. Lester,* for plaintiff in error.
*Willingham & Willingham,* contra.

· BECK, J. The report of the auditor before whom the case was tried contained the following finding: "I find likewise that all the lumber one inch thick on and coming from the third yard on which the mill was located, which I shall hereafter call the Jones lumber, was sawed for plaintiff Jones; that he was a bona fide purchaser of such lumber, advanced $162.00 on the purchase-price of same, and was equitably entitled to a specific performance of his contract, and is entitled to have the lumber delivered to him as a good faith purchaser upon tendering to defendant any amount still due for same under his contract of purchase." Mrs. Yates, who claimed to be a bona fide purchaser of the same property, filed exceptions to this finding on the ground that the same was contrary to the evidence. The court below overruled her exceptions, and she sued out a bill of exceptions to this court.

While there were numerous parties to this case, and the pleadings made many issues, the exceptions to the findings and rulings of the auditor were comparatively few; and finally, under the ruling of the judge sustaining the auditor in all other respects and ruling against all other exceptions to his report, the issues were narrowed to the single one growing out of an exception to the finding of the auditor in favor of the defendant in error, Jones; and thus but a single question is presented for determination, and that is: whether or not the auditor's holding was correct, that Jones was the bona fide purchaser of certain lumber, on the purchase-price of which he advanced the sum of $162, and was equitably entitled to a specific performance of his contract with one Madden, against whom the petition in the case had been filed by persons alleging themselves to be creditors and lienors. The testimony of Jones, which it is contended supports and authorizes the finding of the au-

ditor, is set forth in the bill of exceptions, and in substance is as follows: "Mr. Madden's sawmill was located near Mr. Kimball's in 1909. I bought forty thousand feet of lumber from him in 1909. I agreed to pay him seventy-five cents per hundred. I paid him $162 on the lumber. The receiver sold this lumber. The announcement was made at the time of the sale by my attorney, Mr. Willingham, that I had bought the lumber and had paid part of the purchase-price, and was ready to pay balance. I am still ready to pay the balance and carry out my contract. The lumber Mr. Yates was interested in was at the first and second settings. My lumber was at the third setting. I went to Mr. Madden's mill and confirmed the trade for lumber that had been made by my agent. I let him have the money to run his mill with. I have never had any part of the lumber delivered to me. Mr. Madden skipped out when I wanted the lumber checked out to me. It was understood between Mr. Madden and myself that this was to be full value of the lumber. I did not receive any lumber from Madden. The money I advanced was for running the mill. I understood from what he told me that this was all the lumber. He cut forty-seven thousand feet during the time. I was to buy forty thousand feet. I kept advancing him money with the understanding that I could get all the lumber cut at this setting. Forty-seven thousand feet was all he cut and was all I could expect to get. It was about seven thousand feet more than I was originally to get. My lumber was to be cut at the third setting. Madden moved the mill to the third setting. The lumber at the first and second settings was to be one and one eighth inches thick. I had my lumber cut one inch thick. About forty-seven thousand feet was sawed with my money. Madden was not present when I checked the lumber." The witness Towery, introduced on behalf of Jones, testified: "I am father-in-law of B. F. Jones. I act as his agent when he is away. I made the trade with Mr. Madden for Mr. Jones. Mr. Madden was then at the second setting, and he moved his mill to the third setting and sawed lumber for Mr. Jones. The lumber was to be cut 12 to 16 feet long, and 4, 6, 8, and 10 inches wide, and one inch thick, as per Mr. Jones's order. The lumber was to be cut for 75 cents per hundred feet. Mr. Jones and myself paid something on this lumber. Mr. Jones ratified the contract. He went over to the mill and ratified it,

and paid out money to Madden on the contract. No certain amount of lumber was to be sawed. All of the lumber cut at the third setting was for Mr. Jones. I do not know whether Mr. Yates furnished any money for the third setting or not. No lumber was ever delivered to Mr. Jones, and no money was ever refunded to me or to Mr. Jones. I did not have any writing with Mr. Madden. I gave him no instructions in writing. Madden told me that he needed money to run his mill, and that he wanted this money to run the mill with. Said he couldn't run the mill without the money. I was to get the lumber after it was cut and dry. I do not know how much he cut at the second setting after I advanced the money. I do not know how much was cut at the third setting. I never checked up any lumber at either stand." Other evidence was introduced by Jones, contradicting Yates's testimony to the effect that he had checked up the lumber which Jones claimed, and that it had been delivered to him (Yates).

While the testimony of Jones in his own favor was that he advanced the sum of $162 to Madden, who was operating a sawmill, and that this $162 was in part payment of 40,000 feet of lumber of given character and dimensions which Madden, the owner and operator of the sawmill, was to cut for Jones, we do not think that under the evidence the contract of sale of the lumber at any time became complete and executed, but rather that it remained an executory contract of sale. It is to be borne in mind that at the time Jones made the advancement of the money to Madden the lumber for which this money was advanced was not in esse. It was still to be produced by cutting timber into the dimensions stipulated. And while it was piled, after having been cut, upon a designated yard, it was never received, marked, and accepted by Jones, but was piled in the yard referred to, with some 7,000 feet of other lumber. Before Jones could have become the bona fide purchaser of the lumber, as the auditor found him to be, acceptance and delivery, actual or constructive, should have appeared.

In the case of *Clarke* v. *Wolfe,* 115 *Ga.* 320 (41 S. E. 581), it appears that Clarke Brothers and one Clifton entered into a written contract for the sale of certain timber, in which contract it was stipulated that the latter, who was operating a sawmill, agreed to deliver to Clarke Brothers "all of the timber and lumber he [Clifton] may cut . . (from the present date) from

the lands purchased or to be purchased from the Southern Pine Company of Georgia, . . in Montgomery county, Georgia. The foregoing to be square edge, well manufactured, fresh, of good quality, showing good heart on four sides, saw butted both ends, true, etc. Free from all defects." Clarke Brothers were to pay for the timber at certain rates varying with certain "averages." They made advances to Clifton from time to time, and the latter had delivered them timber. cut from the land referred to in the contract. It was held by this court, that the agreement contained in the writing was an executory contract for the sale of timber and lumber, and title to the same would not pass to Clarke Brothers, until the timber had been sawed and delivered to them, and that the sale by Clifton of any portion of the timber or lumber before it was actually delivered to Clarke Brothers would have the effect to pass the title to the purchaser and defeat any claim which Clarke Brothers might have on the lumber or timber thus sold. The court said further: "In such a case they would be remitted to their action against Clifton for damages for the breach of his contract. Clarke Brothers had no title, under the contract, to any timber or lumber which had not been actually delivered to them." See also, in this connection, Fordice v. Gibson, 129 Ind. 7, and National Bank v. Crowley, 24 Mich. 492.

If Yates were a bona fide purchaser of the same lumber from Madden, though his contract of sale was subsequent in date to the contract between Madden and Jones, he would have acquired a good title to the lumber, and Jones would be remitted to his action for damages against Madden. For, even if, as against Madden, in view of his insolvency, Jones had a right to a decree for specific performance, this could not be enforced as against a bona fide purchaser of the property in controversy.

In his report the auditor refers to a telegram introduced in evidence by Jones, purporting to be from Madden to Jones, which Jones claimed Madden authorized Yates to write for him; but the telegram is not set forth in the report in words or in substance, the auditor merely stating that the telegram had been lost or misplaced, and that he would endeavor to find and attach it. Of course, in this state of the record, we can not undertake to construe the telegram nor determine what effect it would have upon the relative rights of Yates and Jones, nor consider the argument of

counsel that Jones "entered definitely into the contract and began furnishing money to Madden, assured by a telegram from Madden, which Yates subsequently admitted to Jones he had himself written for Madden, that everything was arranged all right."

*Judgment reversed. All the Justices concur, except Hill, J., not presiding.*